

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 02-09-00369-CV

IN THE INTEREST OF D.K.W.,
A CHILD

-----------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

-----------

## MEMORANDUM OPINION[1]

-----------

Appellants D.W. (Father) and J.S. (Mother) appeal from the trial court's termination of their parental rights to daughter D.K.W. In one issue, Mother contends that the evidence is factually insufficient to support the trial court's finding that termination of the parent-child relationship between her and D.K.W. is in the child's best interest. In two issues, Father contends that the evidence is factually insufficient to support the trial court's finding of nonpaternity as well as its finding that termination of the parent-child relationship between Father and D.K.W. is in the

---

[1] *See* Tex. R. App. P. 47.4.

child's best interest.  Because we hold that the evidence is factually sufficient to support the trial court's best interest findings against Mother and Father and because Father did not challenge any other grounds for termination except nonpaternity, we affirm the trial court's judgment.

## I. Findings

After a bench trial, the trial court found that Father did not file an admission of paternity or a counterclaim for paternity or for voluntary paternity to be adjudicated before the final termination hearing.[2]  The trial court also found that Father had (1) knowingly placed or knowingly allowed D.K.W. to remain in conditions or surroundings which endangered her physical or emotional well-being; (2) had his parent-child relationship terminated with respect to another child based on a finding that his conduct at that time had been in violation of subsection 161.001(1)(D) or (E) of the Texas Family Code; (3) constructively abandoned D.K.W. while she was in the permanent or temporary managing conservatorship of Texas Department of Family and Protective Services (TDFPS) for not less than six months and:  (a) TDFPS had made reasonable efforts to return D.K.W. to Father, (b) Father had not regularly visited or maintained significant contact with her, and (c) Father had demonstrated an inability to provide D.K.W. with a safe environment; and (4) failed to comply with the provisions of a court order that specifically established the actions necessary for

---

[2]... *See* Tex. Fam. Code Ann. § 161.002(b)(1) (Vernon 2008).

him to obtain the return of D.K.W.[3] Finally, the trial court found that termination of the parent-child relationship between Father and D.K.W. was in D.K.W.'s best interest.[4]

The trial court also found that Mother had (1) had her parent-child relationship terminated with respect to another child based on a finding that her conduct at that time had been in violation of subsection 161.001(1)(D) or (E) of the Texas Family Code; (2) constructively abandoned D.K.W. while she was in the permanent or temporary managing conservatorship of TDFPS for not less than six months and: (a) TDFPS had made reasonable efforts to return D.K.W. to Mother, (b) Mother had not regularly visited or maintained significant contact with D.K.W., and (c) Mother had demonstrated an inability to provide D.K.W. with a safe environment; and (3) failed to comply with the provisions of a court order that specifically established the actions necessary for Mother to obtain the return of D.K.W.[5] Finally, the trial court also found that termination of the parent-child relationship between Mother and D.K.W. was in D.K.W.'s best interest.[6]

---

[3] *... See id.* § 161.001(1)(D), (M), (N), (O) (Vernon 2008).

[4] *... See id.* § 161.001(2).

[5] *... See id.* § 161.001(1)(D), (M), (N), (O).

[6] *... See id.* § 161.001(2).

## II. Nonpaternity Ground

Father contends in his first issue that the trial court's finding of nonpaternity is unsupported by factually sufficient evidence. Section 161.002(b) of the family code allows an alleged father's parental rights to be summarily terminated if, among other things, the trial court finds, as it did here, that "after being served with citation, he does not respond by timely filing an admission of paternity or a counterclaim for paternity."[7] But the State candidly concedes that under this court's precedent, Father's admission of paternity in his request for counsel suffices to establish his paternity.[8] We agree.

However, along with a best interest finding, a finding of only one ground alleged under section 161.001(1) of the family code is sufficient to support a judgment of termination.[9] Father does not challenge the trial court's findings under subsections (D), (M), (N), and (O).[10] Accordingly, the trial court's error in finding that Father had not admitted paternity is not reversible. We overrule Father's first issue.

---

[7] *See id.* § 161.002(b)(1).

[8] *See, e.g., In re K.W.*, 138 S.W.3d 420, 430 (Tex. App.—Fort Worth 2004, pet. denied); *In re D.D.S.*, No. 02-05-00313-CV, 2006 WL 2309813, at *2 (Tex. App.—Fort Worth Aug. 10, 2006, no pet.) (mem. op.).

[9] *In re E.M.N.*, 221 S.W.3d 815, 821 (Tex. App.—Fort Worth 2007, no pet.).

[10] *See* Tex. Fam. Code. Ann. § 161.001(1)(D), (M), (N), (O).

4

### III. Best Interest

In Mother's sole issue, she contends that the evidence is factually insufficient to support the trial court's best interest finding against her. Father raises the same challenge in his second issue regarding the trial court's best interest finding against him.

#### A. Standard of Review

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own.[11] We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent-child relationship would be in the best interest of the child.[12] If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient.[13]

There is a strong presumption that keeping a child with a parent is in the child's best interest.[14] Prompt and permanent placement of the child in a safe

---

[11] _In re H.R.M._, 209 S.W.3d 105, 108 (Tex. 2006).

[12] Tex. Fam. Code Ann. § 161.001; _In re C.H._, 89 S.W.3d 17, 28 (Tex. 2002).

[13] _H.R.M._, 209 S.W.3d at 108.

[14] _In re R.R._, 209 S.W.3d 112, 116 (Tex. 2006).

5

environment is also presumed to be in the child's best interest.[15]  The following factors should be considered in evaluating the parent's willingness and ability to provide the child with a safe environment:

(1) the child's age and physical and mental vulnerabilities;

(2) the frequency and nature of out-of-home placements;

(3) the magnitude, frequency, and circumstances of the harm to the child;

(4) whether the child has been the victim of repeated harm after the initial report and intervention by the department or other agency;

(5) whether the child is fearful of living in or returning to the child's home;

(6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home;

(7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home;

(8) whether there is a history of substance abuse by the child's family or others who have access to the child's home;

(9) whether the perpetrator of the harm to the child is identified;

(10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision;

(11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time;

---

[15] Tex. Fam. Code Ann. § 263.307(a) (Vernon 2008).

(12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with:

    (A) minimally adequate health and nutritional care;

    (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development;

    (C) guidance and supervision consistent with the child's safety;

    (D) a safe physical home environment;

    (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and

    (F) an understanding of the child's needs and capabilities; and

(13) whether an adequate social support system consisting of an extended family and friends is available to the child.[16]

Other, nonexclusive factors that the trier of fact in a termination case may use in determining the best interest of the child include:

(A)    the desires of the child;

(B)    the emotional and physical needs of the child now and in the future;

(C)    the emotional and physical danger to the child now and in the future;

(D)    the parental abilities of the individuals seeking custody;

(E)    the programs available to assist these individuals to promote the best interest of the child;

---

[16] *Id.* § 263.307(b); *R.R.,* 209 S.W.3d at 116.

7

(F)    the plans for the child by these individuals or by the agency seeking custody;

(G)    the stability of the home or proposed placement;

(H)    the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(I)    any excuse for the acts or omissions of the parent.[17]

These factors are not exhaustive; some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate.[18] Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child.[19] On the other hand, the presence of scant evidence relevant to each factor will not support such a finding.[20]

**B. Analysis**

The trial court heard the following evidence. L.W., Father and Mother's first child, was born in March 2005. In July 2005, while the family was living with the paternal grandparents, L.W. was taken to the hospital with severe injuries—a fractured skull, broken ribs, a healing fractured leg, and a burn to the head. L.W. was placed with his great-grandmother, and she was named his permanent

---

[17] ... *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

[18] ... *C.H.*, 89 S.W.3d at 27.

[19] ... *Id.*

[20] ... *Id.*

8

managing conservator. In October 2006, J.W. was born. He was removed because of the risk of physical abuse, given L.W.'s injuries. Father's and Mother's parental rights to J.W. were terminated in May 2007.

D.K.W. was born on June 12, 2008. Mother admitted in her testimony that although she took prenatal vitamins and obtained sonograms with D.K.W., she did not see a doctor during the pregnancy. D.K.W. was also removed from her parents soon after her birth because of the risk of abuse, given the injuries suffered by L.W. in 2005. After her removal, D.K.W. was placed with a temporary possessory conservator, Theresa B., in late July 2008 and remained in that home at the time of trial, fourteen months later.

D.K.W. had an eye condition while in Theresa's care that required treatment and follow-up visits. But according to CPS caseworker Holley Brown, at the time of trial, fifteen-month-old D.K.W. was very healthy, developmentally on-target, current on medical and dental care, and "just a happy, healthy little girl."

Brown also testified about the parents' successes and failures regarding the court-ordered service plans. She testified that the parents completed individual counseling, couples counseling, parenting classes, and a psychological evaluation. Father completed anger management classes, and Mother completed domestic violence classes.

The parents had housing during the pendency of the case, living in four different homes in one year. Brown did not consider having four different homes in

9

one year to be stable. At trial, the parents lived with the paternal grandmother and her husband. Brown had visited the home and had no concerns about any dangers stemming from the physical structure of the house; she admitted that the home was stable. When L.W. suffered his severe injuries, he, Mother, and Father were also living in that home.

Father had told Brown that he was employed, but she did not know where he was working at the time of trial. Father and Mother both testified that Father was unemployed at trial but doing sporadic lawn care with his stepfather and looking for steady work; Mother testified that she was not working but was attending school. Neither Father nor Mother completed a driving test to obtain a driver's license, despite the safety plan requirement.

Brown testified that the parents did not visit D.K.W. the required two to three times per week. Also, Father did not submit to a random drug test within twenty-four hours of CPS's request, nor did he complete, or even start, Recovery Offering Alternative to Drugs (ROADS) classes. Finally, Brown could not verify whether Mother had completed her MHMR assessment or whether Father was maintaining a drug-free lifestyle.

Mother's psychological evaluation indicated that she had depression and anxiety and recommended a mental health screening. Mother knew since March 2009, six months before trial, that she needed to complete the screening. Mother testified that she did not get a screening because she would have had to pay for it

10

and did not have enough money to do so. She admitted that she never went back to MHMR after Brown told her that CPS would pay for the mental health screening.

On March 26, 2009, about six months before trial, Father took a hair follicle test, the results of which caused Brown to be concerned. On April 2, 2009 and July 8, July 9, and July 10, 2009, Father was asked but failed to take a urinalysis drug test within twenty-four hours. On July 13, 2009, about a year after D.K.W. was removed from the parents and less than three months before trial, Father took a urinalysis drug test but admitted then that he had smoked marijuana a month and a half earlier. Brown testified without objection that Father tested positive for drugs in 2009, and Father admitted at trial that he had smoked marijuana two or three months before trial. Father testified that he did not believe that he had a drug problem.

Brown testified that CPS was "[v]ery, very concerned" about the lack of consistent visits between the parents and D.K.W. Beginning in September 2008, the parents were allowed to visit D.K.W. in Theresa's home two times a week for two hours. Mother testified that sometime before November 2008, the visits became tense and stressful. She said that D.K.W., who cried a lot, would be distracted by "everyone [who] came in and out" and would want to go to "who[m] she remembered instead of" her parents. Mother also said that those people would reach for D.K.W., who would also reach for them.

11

Mother claimed that Theresa told Brown that D.K.W.'s eye condition would "flare up" when D.K.W. cried or screamed. Mother testified that she and Father therefore "tried to keep [D.K.W.] from screaming . . . [i]nstead of forcing her to" go to them and "just let her ease her way to [them] instead of forcing her to scream all the time." Mother also testified that until November 2008, she and Father were visiting D.K.W. twice a week, at least three or four hours at a time.

Near Thanksgiving, she and Father had a four-hour unsupervised visit followed on the same day by a four-hour supervised visit with D.K.W. Mother said that the visits went fine that day, but that afterward, when she and Father would call Theresa and leave messages to set up more visits, Theresa would not call them back. Mother said that she and Father notified CPS and that thereafter, they would telephone Brown, who would telephone Theresa and then let the parents know whether they could go to Theresa's house for a visit.

Brown testified that because the parents were not visiting twice a week for two hours, but were instead visiting only about three times per month, in January 2009 CPS changed the visitation schedule to one hour per week at the CPS office. The parents completed two of four visits in January 2009. D.K.W. cried loudly on the first visit, and her parents were disappointed that she was not attached to them. Mother said at the time that D.K.W. did not know who Mother was. In February 2009, the parents visited D.K.W. consistently, and they began to bond. In March 2009, CPS expanded visits to four hours per week in anticipation of a monitored return of

12

D.K.W. to the parents. Apparently the visits were changed back to take place at Theresa's home instead of the CPS office. In mid-March 2009, the parents and Theresa both called Brown. The parents told Brown that Theresa would not allow visits; Theresa told Brown that the parents were not visiting. For whatever reason, no visits occurred until March 25, 2009, when Brown had a meeting with the parents and Theresa at Theresa's home. A new visitation schedule was agreed upon, and the parents visited with D.K.W. that day. She cried when Mother held her. A week later, at the April 2, 2009 permanency hearing, D.K.W. initially cried when her parents held her. The parents complained to Brown that day that the visits were difficult at Theresa's home because she and D.K.W. were attached to each other.

Brown tried to set up an alternative schedule thereafter but was unable to reach the parents. When she called them on April 27, 2009, she discovered that their telephone had been disconnected. On June 1, 2009, after not speaking with the parents since the April 2, 2009 hearing, Brown went to their home but was unable to see them despite waiting at least twenty-five minutes after a roommate answered the door. A few minutes after Brown left, Father called her.

After she received the results from Father's July 2009 drug test, which were apparently positive, visits were moved back to the CPS office, and the parents were notified of the change. Brown tried to reach the parents by telephone and through relatives from July through August 24, 2009 with no success; on August 24, she visited their last known residence and discovered that they no longer lived there.

13

On August 25, 2009, Brown learned that Mother had given birth to another baby boy on July 17, 2009. At the time of trial, this baby remained with his parents, and no safety plan had been generated regarding him. Mother testified that she did not tell Brown about the pregnancy because she was worried that CPS would try to take that baby and not return D.K.W. The parents visited D.K.W. on September 3, 2009, after CPS decided not to remove the new baby, and they visited her once more in September.

On cross-examination, Brown admitted that Theresa and the parents attend the same church and that the parents would sometimes see D.K.W. at church. But Brown stated that she knew of only two church visits—April 5, 2009 and April 12, 2009. Theresa also testified that the parents had visited with D.K.W. at church only twice, even though all had been in attendance more than that.

In summary, neither parent visited D.K.W. at all in the latter half of April or in May, June, July, and August 2009. Mother testified that she was not quite sure why she did not attend the visits with D.K.W. at the CPS office. She testified that she and Father did not visit D.K.W. at Theresa's house three to four times per week because of transportation problems and because Father was working. She also testified that they did not visit D.K.W. from mid-April 2009 through the end of August 2009 because of Mother's pregnancy, her school and car pool schedule, their jobs, and complications with Theresa. Father testified that they did not visit D.K.W. as often as CPS would like because of transportation issues, tension with Theresa, and

14

D.K.W.'s eye issues. Mother admitted that not visiting D.K.W. from mid-April 2009 until early September 2009 hurt the parent-child bond. Mother additionally admitted that the absence of the parent-child bond between D.K.W. and Mother was mostly her fault but also claimed that Theresa bore partial responsibility.

Theresa testified that she encouraged the parents to interact more with D.K.W. Theresa testified that she brought D.K.W. to court for various hearings and tried to get the parents to hold her. Theresa claimed that the parents would not hold D.K.W. because they did not want to hear her cry. At the church visits, Theresa would let D.K.W. sit with them.

Theresa testified that she notified the parents of D.K.W.'s doctor's visits so that they could attend. Theresa said that the parents attended two appointments but left before the doctor arrived. Mother testified that she was not notified of any of the doctor's visits regarding D.K.W.'s eye condition.

The parents did provide some financial support to D.K.W. during the pendency of the case, buying a stroller, car seat, clothes, and diapers for her, but Brown stated that the financial support was sporadic. Theresa testified that Mother and Father gave her thirty dollars at one court appearance, but nothing since that date.

Brown believed that the parents were not really willing to effect positive environmental and personal changes, given Father's 2009 drug use and Mother's failure to obtain a mental health screening. Brown also testified that she did not

15

believe that D.K.W.'s parents could meet the child's emotional and physical needs because

> [j]ust the experience with the parents in this case and the inconsistencies in visiting a child was just definitely very important. I cannot positively say that her emotional needs would be met on a consistent basis and the child definitely needs structure, stability, and consistency.

When asked to describe Father's and Mother's parenting skills and abilities, Brown stated, based on the overall visits,

> Unfortunately, I don't really know what their parenting skills are like. History states that they haven't had custody of any of the children. I know that they did take a parenting class. I don't really know what their parenting skills are like. . . .
>
> . . . .
>
> They are appropriate in visits with their child. That would be all the evidence that I would have of their parenting skills.

Brown testified that D.K.W. was not bonded to the parents and that their attempts to console her when she cried in their arms generally were unsuccessful. Brown testified that termination is in D.K.W.'s best interest and that TDFPS's plan is adoption by Theresa.

Brown testified that Theresa is very caring, that she maintains D.K.W.'s medical, dental, emotional, and physical needs, and that Theresa acts like she is D.K.W.'s mother and behaves accordingly, appropriately supervising her. Brown stated that Theresa's home is stable and safe.

16

On cross-examination, Brown admitted that Theresa had not been considered as a placement for D.K.W.'s older brother J.W. because Theresa was involved with a sex offender when J.W. was removed from his parents. Theresa confirmed that a sex offender had lived with her back then but stated that no sex offenders had lived with her since D.K.W. had begun living with her. Brown testified that she makes at least two unscheduled visits to Theresa's home per month to ensure that she is no longer involved with that sex offender.

When asked whether she knew that her son-in-law was a sex offender, Theresa denied any knowledge of that status; she also made clear that while her son-in-law had been around D.K.W. in her home, he did not play with the child. Theresa further testified that now that she knew that he was a sex offender, she would not allow him to take care of D.K.W. or to be around her. Theresa signed a safety plan to that effect during trial.

Applying the appropriate standard of review, we cannot conclude that the evidence not supporting the trial court's findings on best interest is so significant that the trial court could not reasonably have formed a firm belief or conviction in the truth of its findings.[21] Accordingly, we hold that the evidence is factually sufficient to support the trial court's findings that termination of the parents' rights is in D.K.W.'s best interest. We overrule Mother's sole issue and Father's second issue.

---

[21] ... *See H.R.M.*, 209 S.W.3d at 108.

## IV.  Conclusion

Having overruled both of Father's issues and Mother's sole issue, we affirm the trial court's judgment.

LEE ANN DAUPHINOT
JUSTICE

PANEL:  LIVINGSTON, C.J.; DAUPHINOT and GARDNER, JJ.

DELIVERED:  October 7, 2010